FILED
MAILROOM
FEB - 3 2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA VIRGINIA

| | | |
|---|---|---|
| JOSHUA KEITH BOYER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. 1:26 cv 319 |
| | § | |
| LEXISNEXIS RISK SOLUTIONS, | § | |
| FIRST ADVANTAGE BACKGROUND | § | |
| SERVICES, INC., and GLOBAL HR. | § | |
| RESEARCH | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendants. | § | |

## COMPLAINT IN CIVIL ACTION

Comes now, Plaintiff, Joshua Keith Boyer, and files this complaint, and in support thereof states as follows:

### I. INTRODUCTION

1. This action arises from a systemic pattern of unlawful publication, maintenance, and dissemination of false and defamatory criminal records by Defendants LexisNexis Risk Solutions Inc. ("LexisNexis"), First Advantage Background Services, Inc. ("First Advantage"), and Global HR Research, LLC ("Global HR Research," and collectively, "Defendants"). Plaintiff Joshua Keith Boyer brings this action under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"), and Virginia common law.

2. Defendants have knowingly or recklessly maintained, reported, and disseminated false and misleading criminal records about Plaintiff to employers, housing providers, and other third parties. These false records have been catastrophic for Plaintiff's professional life, employment prospects, housing opportunities, and emotional well-being.

3. Specifically, Defendants have reported:

(a) A false "outstanding federal warrant" that was released on April 16, 2013, yet continued to appear on background checks as an active warrant through at least 2024—11 years after its release;

(b) False characterizations of Plaintiff's non-violent federal conviction as involving a "violent crime" and "machine gun," labels that were erroneous and contradict both the federal charging documents and a December 23, 2024 Order from the United States District Court for the Middle District of Florida ;

(c) Duplicate and misleading criminal records that artificially inflate the appearance of Plaintiff's criminal history.

4. When Plaintiff attempted to exercise his statutory right to dispute these false records under 15 U.S.C. § 1681i(a), Defendants engaged in a pattern of obstructionism spanning over three years, repeatedly denying Plaintiff's disputes under the pretextual claim that they could not "verify his identity," despite Plaintiff's submission of standard identification documents including driver's license, lease agreements, and utility bills. Defendants' own policies allowed acceptance of these documents.

5. As a direct result of Defendants' unlawful conduct, Plaintiff was denied countless employment opportunities, housing, and the ability to rebuild his life following his release from federal prison and receipt of executive clemency. Most significantly, a conditional job offer from Stand Together Chamber of Commerce (a Koch network policy organization) was placed in jeopardy in December 2022— but Plaintiff was hired and subsequently worked there until his unexpected termination in July 2024, during which period his advancement opportunities were

negatively impacted--when Stand Together reviewed the false background records provided by Global HR Research, LLC.

6. Plaintiff seeks relief for Defendants' violations of the FCRA, Virginia common law defamation, violation of the Virginia Consumer Protection Act, negligent infliction of emotional distress, and negligent misrepresentation. Plaintiff further seeks statutory damages, punitive damages, actual damages for lost employment opportunities and emotional distress, and attorney's fees from all three Defendants.

**II. JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over Plaintiff's FCRA claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as the FCRA is federal law. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b), because Plaintiff resided in Alexandria, Virginia (within this district) at the time the conduct complained of occurred and when the claims arose. Defendants have conducted business affecting residents of this district.

9. This Court has personal jurisdiction over Defendant LexisNexis because LexisNexis operates a consumer reporting business that provides reports to consumers and third parties throughout the United States, including the Commonwealth of Virginia. LexisNexis' activities were directed at Plaintiff in Virginia and affected his ability to obtain employment and housing in Virginia.

10. This Court has personal jurisdiction over Defendant First Advantage because First Advantage is a national background screening company that conducts business throughout the United States, including Virginia. First Advantage provided background reports containing the

false records complained of herein to Plaintiff's prospective employers while Plaintiff was residing in Virginia.

11. This Court has personal jurisdiction over Defendant Global HR Research, LLC because Global HR Research is a national background screening company that conducts business throughout the United States, including Virginia. Global HR Research was retained by employers within this district and disseminated background reports to Virginia-based employers and to Plaintiff while Plaintiff was residing in Virginia. Global HR Research's activities were directed at Plaintiff in Virginia through its preparation and transmission of the background report that damaged Plaintiff's employment prospects and reputation.

**III. PARTIES**

A. Plaintiff

12. Joshua Keith Boyer is an individual residing at 137 East Reed Avenue, Alexandria, Virginia 22305. Plaintiff is a consumer as defined by the FCRA, 15 U.S.C. § 1681a(c).

13. Plaintiff received a commutation of his federal sentence from President Barack Obama on August 3, 2016, after serving approximately 16 years in federal prison. President Obama's commutation recognized that Plaintiff was a "non-violent offender" and offered Plaintiff a "second chance" to rebuild his life.

14. Prior to his federal conviction, Plaintiff had worked legitimately and maintained stable housing. Following his release from prison and commutation, Plaintiff has worked diligently to rehabilitate his reputation and contribute meaningfully to society, including work as a paralegal/senior case manager and as an advocate for criminal justice reform.

B. Defendants

15. Defendant LexisNexis Risk Solutions Inc. is a Delaware corporation with principal offices at 1000 West Street, Suite 300, Wilmington, Delaware 19801. LexisNexis is in the business of maintaining, compiling, and disseminating consumer reports and criminal records to consumer reporting agencies, employers, landlords, and other third parties. LexisNexis is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

16. LexisNexis operates a criminal records database that is used by employers, background screening companies, law enforcement, and other entities nationwide. LexisNexis obtains criminal record information from public sources and databases, compiles that information, and makes it available through various products and services including its LexisNexis Risk Solutions platform.

17. LexisNexis has been the subject of multiple prior lawsuits alleging violations of the FCRA, defamation, and violations of state consumer protection laws. These suits have resulted in substantial judgments against LexisNexis.

18. Defendant First Advantage Background Services, Inc. is a national background screening and verification services company with principal offices located in Atlanta, Georgia and other locations throughout the United States. First Advantage is an "investigative consumer reporting agency" as defined by 15 U.S.C. § 1681a(e).

19. First Advantage provides employment background screening services to employers nationwide. First Advantage obtains criminal record information from various sources, including LexisNexis and other consumer reporting agencies, and compiles that information into background reports that are provided to employers and other third parties.

20. First Advantage is engaged in the business of providing background reports to Plaintiff's prospective employers. First Advantage provided the background reports containing

false criminal records that were disseminated to Robert Half International and other employers in the State of Virginia complained of herein.

21. Defendant Global HR Research, LLC is a consumer reporting agency and background screening company formerly known as GHRR (now operating as DISA Global Solutions - Formerly GHRR) with principal offices in Fort Myers, Florida and other locations throughout the United States. Upon information and belief, Global HR Research is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f) and/or an "investigative consumer reporting agency" as defined by 15 U.S.C. § 1681a(e).

22. Global HR Research provides employment background screening and verification services to employers nationwide. Global HR Research obtains criminal record information from various sources, including Defendant LexisNexis, and compiles that information into background reports that are provided to employers and other third parties.

23. On or about December 20, 2022, Global HR Research prepared and furnished a background report to Stand Together Chamber of Commerce, headquartered in the State of Virginia on Plaintiff Joshua Keith Boyer. The report was titled "Global HR Research, LLC: Report Results" and bore report ID 8877809. This report was prepared by Global HR Research using data that Global HR Research knew or should have known was false, inaccurate, and defamatory. Global HR Research transmitted this false report to Stand Together despite its duty to follow reasonable procedures to assure maximum possible accuracy under 15 U.S.C. § 1681e(b).

24. Global HR Research did not verify the accuracy of the underlying criminal record data against source documents, despite the availability of federal charging documents and federal court docket sheets. Global HR Research negligently relied upon false or incomplete summaries from

LexisNexis without conducting the reasonable verification procedures required of a professional background screening company.

25. On information and belief, as a result of Global HR Research's negligent preparation and transmission of the false background report to Stand Together, Plaintiff lost the Stand Together employment opportunity and suffered consequential damages including lost wages, loss of promotion opportunities, emotional distress, and damage to professional reputation.

26. Defendants Does 1-10 are individuals and/or entities whose identities are currently unknown but who are responsible for the conduct alleged herein. These individuals may include employees, contractors, or agents of LexisNexis, First Advantage, or Global HR Research who maintained, reported, or disseminated the false records. Plaintiff will amend this Complaint to name these defendants when their identities are ascertained through discovery.

**IV. FACTUAL BACKGROUND**

A. Plaintiff's Federal Conviction and Clemency

27. On February 8, 2001, Plaintiff was charged in the United States District Court for the Middle District of Florida with:

(a) Count 1: Conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846 and § 841(b)(1)(A)(ii);

(b) Count 2: Possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A) and (B)(i);

(c) Count 3: Possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5861(d) and 5871.

28. On November 27, 2001, Plaintiff was sentenced to 288 months in federal prison.

29. Plaintiff served approximately 17 years in federal prison, when President Barack Obama commuted his sentence as part of the Obama Administration's Clemency Initiative. The commutation letter recognized that Plaintiff was a "non-violent offender."

30. Critically, Plaintiff's conviction was predicated on drug conspiracy and firearm possession charges. Plaintiff was NOT convicted of any violent crime. Plaintiff did NOT possess a machine gun. Plaintiff's conviction, while serious, did not involve actual violence.

31. The federal court recognized at sentencing that Plaintiff's prior offenses lacked a violent element. *See* United States v. Boyer, No. 8:01-CR-56-T-30TBM (M.D. Fla.), Dkt. No. 222 at 24 (Court acknowledging that "prior offenses don't have a violent element in them").

B. The Three False and Defamatory Records

*CRCAC09520CFANO: The False "Outstanding Federal Warrant"*

32. In February 2013, while Plaintiff was serving his federal sentence, he was transported from his assigned federal prison to the Pinellas County Jail in Florida (which contracts with the federal government to house federal prisoners locally) so that Plaintiff could appear in federal court in Hillsborough County.

33. When Plaintiff was booked into the Pinellas County Jail on February 27, 2013, the Pinellas County Jail placed a courtesy "US Marshals detainer" (also known as a "hold") on Plaintiff. As explained by Plaintiff's attorney in a December 2, 2022 letter from Ripley Whisenhunt law firm: "The detainer was a flag so to speak that before Mr. Boyer could be released from the jail's custody, the US Marshals Service would need to be contacted because Mr. Boyer was in fact serving a sentence for a federal conviction versus a sentence for a conviction originating from a prosecution by the State of Florida."

34. This detainer was purely ministerial and administrative in nature. It was released on April 16, 2013, when Plaintiff was released from the Pinellas County Jail and returned to federal custody.

35. Despite the detainer being released on April 16, 2013, the Pinellas County Clerk's Office and LEXIS Nexis failed to properly document the release in their system. As a result, the detainer continued to appear as an open hold/active warrant in the Pinellas County and LEXIS databases.

36. Background check companies, including those used by employers, search these public databases when compiling background reports. As a result, the false detainer continued to appear on Plaintiff's background checks as an "OPEN WARRANT" for over a decade after its release.

37. In November 2022, when Plaintiff applied to drive for Uber, the background check from Checkr erroneously reflected that Plaintiff had an "open warrant" and "federal hold in Pinellas County Florida." Uber rejected Plaintiff's application based on this false information.

38. The false warrant also continued to appear on other background checks reviewed by potential employers through at least 2025.

39. On November 30, 2022, the Pinellas County Sheriff's Office and Clerk's Office finally corrected the record, with the Clerk's Office updating their records to show that the hold was released on April 16, 2013. However, background check aggregators and databases had not fully updated their systems to reflect this correction.

40. Defendants LexisNexis and First Advantage, as professional background screening companies, had a duty to:

(a) Verify the accuracy of court records before reporting them;

(b) Update their databases when public records were corrected;

(c) Respond to consumer disputes about false warrants.

41. Defendants failed in these duties.

*8:01-cr-56-JSM-TGW: The False "Violent Crime/Machine Gun" Labels*

42. The federal docket sheet for Plaintiff's case (Case No. 8:01-cr-56-JSM-TGW) contains a clerical error. At the top of the docket sheet, where the offense of conviction is listed, the system includes a shorthand description that reads: "VIOLENT CRIME/DRUGS/MACHINE GUN."

43. This characterization is entirely false and contradicts both the charging documents and the judgment:

(a) Violent Crime: Plaintiff was NOT convicted of a violent crime. Plaintiff's only convictions are drug conspiracy (21 U.S.C. § 846) and firearm possession (18 U.S.C. §§ 924(c) and 5861). Neither of these offenses constitute crimes of violence under federal law. The predicate offense for the § 924(c) charge is the drug conspiracy, which is not a crime of violence.

(b) Machine Gun: Plaintiff did NOT possess a machine gun. A "machine gun" is defined by 26 U.S.C. § 5845(b) as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." Plaintiff was arrested with a semi-automatic assault rifle—a legal civilian weapon. Plaintiff was NOT charged with or convicted of possessing a machine gun. If he had been, the charge would have been 18 U.S.C. § 924(c)(1)(B)(ii), which carries a mandatory consecutive 30-year sentence. Plaintiff's total sentence was 288 months (24 years), which is inconsistent with a machine gun conviction.

44. This clerical error on the federal docket and CRA databases has been catastrophic. Background screening companies, including LEIXS Nexis, Global HR Research and First

Advantage, extract information from federal dockets to populate background reports. When a docket says "VIOLENT CRIME/DRUGS/MACHINE GUN," background companies copy that language into their reports, even though it is false and does not match the actual charging documents.

45. As a result, Plaintiff's background checks state that he was convicted of "violent crime/drugs/machine gun," a characterization that is fundamentally misleading and false.

46. On December 11, 2024, Plaintiff filed an emergency motion in federal court (United States District Court for the Middle District of Florida, Case No. 8:01-cr-56-JSM-TGW, Dkt. No. 447) to correct this clerical error under Federal Rule of Criminal Procedure 36.

47. On December 23, 2024, the federal district court GRANTED Plaintiff's motion. The Court ordered the Clerk to strike "VIOLENT CRIME and MACHINE GUN" from the docket and replace those labels with only "18:924C.F DRUGS." *See* United States District Court for the Middle District of Florida, Order at Dkt. No. 451 (December 23, 2024).

48. The federal court's December 23, 2024 Order definitively confirms that the "violent crime/machine gun" characterization was erroneous and that Plaintiff's conviction should be labeled only as involving "DRUGS."

49. This federal court order is conclusive evidence that Defendants LexisNexis, First Advantage, and Global HR Research have been publishing false and defamatory information about Plaintiff.

*1998CF239: Duplicate and Misleading Records*

50. Background records for Plaintiff also include case number 1998CF239, which appears as a duplicate reference to criminal records—it actually appears on three separate pages--that artificially inflates the appearance of Plaintiff's criminal history.

51. LexisNexis denied the existence of this record in its February 1, 2025 response to a Consumer Financial Protection Bureau complaint.

52. The repetition and misleading nature of this record has compounded the damage caused by the other false records.

C. Pattern of Obstruction and Blockage of Dispute Rights

53. In violation of 15 U.S.C. § 1681i(a), when Plaintiff attempted to exercise his statutory right to dispute the false records, Defendants engaged in a deliberate pattern of obstruction.

54. Beginning in Winter 2022, after Stand Together Chamber of Commerce ran a background check on Plaintiff (discussed below), Plaintiff sought to dispute the false "violent crime/machine gun" characterization.

55. Plaintiff's disputes—more disputes will be revealed via discovery in this matter—were submitted through various channels:

(a) CFPB Case No. 250118-18131801

(b) CFPB Case No. 250118-18131031

(c) LexisNexis Case No. SF-01759063

(d) LexisNexis Case No. SF-03010676

(e) CFPB Case No. 250118-18132671

(f) LEXIS Demand Letter – 6/17/25 (attached)

56. Each time Plaintiff submitted a dispute (for several years), Defendants claimed they could not "verify his identity" and refused to process the dispute.

57. This claim was pretextual and false. Plaintiff submitted:

(a) Government-issued driver's license

(b) Lease agreements

(c) Utility bills

(d) Other standard identification documents

(e) Exact documents that consumers are required to submit

58. These are the exact documents that consumers are required to submit for identity verification purposes. The FCRA and industry standards specifically contemplate that consumers will submit these documents. Defendants' refusal to accept them was not based on any legitimate identity verification concern; it was a deliberate obstruction of Plaintiff's statutory dispute rights.

59. This pattern of obstruction lasted over three years, from Winter 2022 through early 2025.

60. During this three-year period, the false records continued to be reported to employers and other third parties, causing ongoing harm to Plaintiff.

61. Only when Plaintiff filed a Demand Letter June 17, 2025 (attached) did LexisNexis finally respond. Even then, LexisNexis simply claimed the records "did not exist" in its files—a patently false response, since the records had been reported to employers and background companies.

D. The "Identity Verification Loop": A Systemic Policy of Obstruction

62. Defendants' failure to investigate was not the result of a technical inability to verify Plaintiff's identity, but rather the result of a deliberate corporate policy designed to fatigue consumers and suppress dispute volume.

63. Pretextual Rejections: Plaintiff submitted standard, government-issued identification (Driver's License) and proof of residence (Lease/Utility Bills) that meet or exceed industry standards for identity verification (CIP). Plaintiff submitted the exact documents that consumers are required to submit. Defendants' own policies allowed acceptance of these documents.

64. Willful Blindness: Defendants possess sophisticated data fusion technology (e.g., LexisNexis Accurint) capable of verifying an individual's identity instantly. Defendants' refusal to use their own proprietary data to verify Plaintiff, while simultaneously selling that same data to third parties, demonstrates that the "identity verification" rejection was pretextual.

65. The "Loop" Tactic: Upon information and belief, Defendants utilize automated mail-sorting logic that defaults to "Unable to Verify Identity" letters to avoid the cost and statutory burden of conducting a substantive reinvestigation under 15 U.S.C. § 1681i within the mandated 30-day window.

66. By trapping Plaintiff in this "Identity Verification Loop," Defendants successfully maintained the false "Violent Crime" label on Plaintiff's file for years, stripping him of his statutory right to a reinvestigation.

E. Employment Harm Caused by False Records

*Stand Together Chamber of Commerce – December 2022*

67. In December 2022, Plaintiff applied for a position with Stand Together Chamber of Commerce, a policy organization affiliated with the Koch Network.

68. Stand Together conducted a background check through Defendant Global HR Research, LLC. The background report was dated December 20, 2022, bore Report ID 8877809, and was titled "Global HR Research, LLC: Report Results."

69. Upon information and belief, Global HR Research obtained the criminal record data contained in this report from Defendant LexisNexis's criminal records database. This data included the false characterizations of Plaintiff's criminal conviction, specifically the false "violent crime/drugs/machine gun" label that originated from the federal court docket clerical error.

70. Global HR Research had a duty under 15 U.S.C. § 1681e(b) to follow reasonable procedures to assure maximum possible accuracy of the information before transmitting the report to Stand Together. Global HR Research failed in this duty by:

(a) Failing to verify the "violent crime/machine gun" labels against the federal charging documents;

(b) Negligently relying upon false or incomplete summaries from LexisNexis without verification;

(c) Transmitting a report marked "Draft: Report Not Fully Complete" to Stand Together;

(d) Failing to conduct even basic due diligence to verify that the characterizations matched the actual federal conviction.

71. The Global HR Research background report contained the false characterizations of Plaintiff's criminal conviction, including the false "violent crime/drugs/machine gun" label, and was responsible for Stand Together's adverse action against Plaintiff.

72. On December 22, 2022, at 2:39 PM EST, Annette Harper, a recruiter at Stand Together, sent Plaintiff an email expressing concern about the background report. The email states: "Regarding the criminal record, we knew about your prior history but did not know the details of specific charges. Given the severity of the charges, would you be open to a conversation so we can understand your background, the time served, and the steps you have taken to grow, learn from the experience, and start a new path? EA roles in our community have access to various organizational and personal financial information, spending authorities, P-cards, etc. We do have some sensitivity to moving forward, given this information."

73. Later that same day, at 4:01 PM EST, Annette Harper sent a second email formally documenting the adverse action process. This email states: "The report referenced matters that we

believe justified an additional review of your application, namely the criminal charges related to case number 8:01-CR-00056 (Conspiracy to distribute narcotics, violent crime/drugs/machine gun, and unlawful to receive a firearm not registered). As part of our conversation, you agreed to provide a written explanation and documentation by COB December 28th to clarify this discrepancy. Failure to provide this information may result in adverse action."

74. Stand Together was placing conditions on Plaintiff's conditional job offer based on the false "violent crime/drugs/machine gun" characterization in the background report.

75. Stand Together required Plaintiff to provide written documentation "by COB December 28th" to "clarify" the charges. This gave Plaintiff only 6 business days to resolve false accusations about a violent crime with a machine gun.

76. Stand Together's emails make clear that the company's "sensitivity" and concern about "moving forward" was directly tied to the false characterization of Plaintiff's conviction as involving a "violent crime" and "machine gun." Without this false characterization, Stand Together would not have imposed these conditions or threatened adverse action.

77. The emails also reveal Stand Together's concern about Plaintiff's access to organizational and financial information due to the perceived "severity of the charges." This concern was based entirely on the false characterization in the background report. It also set the stage for how Plaintiff's 18-month tenure at the company would be handled by management.

78. As a result of Defendants' false and defamatory reporting, Plaintiff faced the contingency of a conditional job offer being withdrawn or rescinded, or at minimum placed in serious jeopardy. Management at Stand Together acknowledged Paintiff was overqualified for the position he was initially hired to perform and promised a quick path to raise and promotion.

Defendants' false and defamatory reporting negatively impacted those prospects as well and on information and belief, contributed significantly to his unexpected termination July 2024.

79. The psychological impact on Plaintiff was severe. Plaintiff had been offered a legitimate employment opportunity to rebuild his life following his commutation, only to have that opportunity placed in peril based on false accusations of a "violent crime" and "machine gun" possession.

Global HR Research's Liability for Stand Together Harm:

80. Defendant Global HR Research bears direct responsibility for this employment/opportunity loss because:

(a) Global HR Research was the "gatekeeper" of information between Plaintiff and Stand Together;

(b) Global HR Research received data from LEXIS Nexis and was obligated to verify its accuracy before transmission to a third party;

(c) Global HR Research possessed the means to verify the information but failed to do so;

(d) Global HR Research's negligence and failure to follow reasonable verification procedures was the proximate cause of Plaintiff's lost employment opportunity;

(e) Global HR Research is independently liable under 15 U.S.C. § 1681e(b) for failure to follow reasonable procedures to assure maximum possible accuracy;

(f) Global HR Research is independently liable under 15 U.S.C. § 1681i(a) for failure to conduct reasonable reinvestigation when Plaintiff later attempted to dispute the information;

(g) Global HR Research knew or should have known that transmitting false criminal records to employers would directly harm consumers;

(h) Global HR Research's conduct was negligent and reckless, warranting punitive damages.

81. Stand Together's job offer represented a critical employment opportunity for Plaintiff to rebuild his life following his release from federal prison and receipt of executive clemency. Global HR Research's negligent misrepresentation of Plaintiff's criminal history caused this life-changing opportunity to be lost when he was abruptly let go in July 2024 and/or placed in serious jeopardy (when he was denied promotion opportunities provided to others with stellar work performance and aptitude). Plaintiff estimates the lost salary value associated with the Stand Together position, including lost advancement and post-termination unemployment, at approximately $140,000 for the period December 2022 through July 2024 (when Plaintiff wasn't promoted, given a raise, or a bonus) and from July 2024 through March 2025 (when Plaintiff was let go until he found other employment).

Robert Half International – October 2024

82. In October 2024, Plaintiff applied for a position with Robert Half International, a legal staffing and consulting firm.

83. Robert Half conducted a background check through Defendant First Advantage Background Services.

84. The First Advantage background report, which contained data obtained from Defendant LexisNexis's criminal records database, again contained the false "violent crime/drugs/machine gun" characterization.

85. On October 21, 2024, Robert Half sent Plaintiff a "Pre-Adverse Action Notice" dated November 1, 2024, citing First Advantage Case ID WPS-298973194.

86. The notice informed Plaintiff that "a decision is currently pending regarding your application for employment" and that "an adverse decision may be made based, in whole or in part, on the enclosed consumer report."

87. Robert Half gave Plaintiff 5 business days to respond or dispute the information.

88. Again, Plaintiff was forced to explain away false accusations of "violent crime" and "machine gun" possession when attempting to secure employment.

89. Plaintiff's application was not approved.

<u>The "Silent Denials": Widespread Reporting to Unknown Third Parties (2017–Present)</u>

90. Upon information and belief, the instances involving Stand Together and Robert Half represent only a small fraction of the total volume of false reports disseminated by Defendants. Since Plaintiff's release from federal custody in 2017, Plaintiff has applied to hundreds of employers, housing providers, and financial institutions.

91. Upon information and belief, Defendants generated and transmitted consumer reports containing the false "Violent Crime/Machine Gun" label and/or the false "Open Warrant" record to numerous other third parties whose identities are currently known only to Defendants.

92. Plaintiff alleges that these "silent denials"—where an application was rejected without a specific adverse action notice or where the notice was lost/not received—were directly caused by the same false records.

93. Plaintiff has faced repeated employment barriers due to the persistent false records, including denials or contingencies from Stand Together, Hecker Fink and other employers.[1] Each

---

[1] This pattern culminated most starkly in Plaintiff's recent experience testifying as a defense witness in *United States v. Shon R. Hopwood*, Criminal Action No. 2023 DVM 1126, in the Superior Court of the District of Columbia. On June 26, 2025, during Plaintiff's direct and cross-examination, the government elicited testimony that: (a) he had prior felony convictions related to a drug conspiracy and firearms possession; and (b) the government believed there was a separate armed robbery conviction in his history. Hopwood Transcript (06-26-25), at 16–18, 60–61, 75–77. Plaintiff unequivocally denied ever being charged with or convicted of armed robbery and explained that any such "armed robbery" entry was a mistaken record issue he had been forced to live with for six-and-a-half years. *Id.* at 13–14. Despite that clarification, the government used this purported armed robbery as impeachment, repeatedly pressing the issue in front of the jury and presenting Plaintiff as a liar whose credibility could be discounted based on non-existent convictions and alleged prior inconsistent statements. *Id.* at 60, 75–77. Less than a week after this testimony, Plaintiff was abruptly separated from his six-figure Senior Case Manager position at Hecker Fink LLP in Washington, D.C., despite having been employed there only a few months, having previously been required to "explain away" the same false "violent crime/machine gun" label at the start of his employment, and having no documented performance warnings or findings of misconduct.

time, Plaintiff was forced to explain that the characterization was false and that he was not convicted of a violent crime.

94. Each time, employers exercised caution or imposed conditions based on the false information.

95. Discovery Reservation: Plaintiff specifically reserves the right to amend this Complaint to name additional third-party recipients of these false reports once Defendants produce their "transmission logs" and "inquiry history" (including "permissible purpose" logs) during discovery. Plaintiff seeks damages for each separate publication of the false defamatory records from 2017 to the present, relying on the "Fresh Publication" doctrine, which holds that each new transmission of a false report constitutes a new, separate violation of the FCRA with its own statute of limitation.

<u>Documented Economic Harm</u>

96. As a direct result of the false records and employment denials, Plaintiff has suffered: As a direct result of the false records and resulting employment denials, Plaintiff has suffered the following economic losses:

(a) Stand Together Employment/Early Termination and Lost Advancement (January 2023–March 2025): Plaintiff was hired by Stand Together in January 2023 as an Executive Assistant at approximately $70,000 per year, with express assurances from management that he was overqualified and would be promptly promoted to a partnership management role with higher pay and bonus eligibility. Despite consistently strong performance reviews and the promotion, raises, and bonuses awarded to similarly situated colleagues who did not have to explain away a non-existent “violent crime” or “machine gun” conviction, Plaintiff was never promoted, given a raise, or paid a bonus. In July 2024, shortly before Plaintiff was scheduled to be promoted into a partnership management position, Stand Together abruptly terminated his employment, and

Plaintiff remained unemployed until March 2025, when he obtained comparable replacement employment. The combined value of (i) lost wages during the unemployment period, (ii) the salary differential between his Executive Assistant pay and the compensation he would have received upon timely promotion to the partnership management role (including the expected raise), and (iii) lost bonuses and other advancement-related compensation, is estimated at approximately $140,000.

(b) Robert Half Employment Opportunity (October 2024): Plaintiff lost a separate employment opportunity with an estimated annual value of approximately $100,000 as a result of the false criminal records appearing in the background report furnished to Robert Half.

(c) Hecker Fink Senior Case Manager Position (2025): Plaintiff later obtained a six-figure Senior Case Manager position at Hecker Fink LLP in Washington, D.C., but just over a week after he testified as a defense witness in *United States v. Shon R. Hopwood*—during which the government impeached him with a non-existent "armed robbery" conviction traceable to the same erroneous criminal history—Hecker Fink abruptly separated him from employment, despite the absence of any documented performance warnings or findings of misconduct. The lost wages and lost advancement opportunities associated with the premature termination of this position are reasonably estimated at $75,000–$125,000.

(d) Other Employment Denials (2017–present): Since his release from custody, multiple additional prospective employers have denied or conditioned employment opportunities because of the same false criminal records, with cumulative lost earnings over approximately eight years reasonably estimated at $200,000–$300,000.

97. Total Documented Lost Wages: Based on the Stand Together employment losses, the lost Robert Half opportunity, the premature separation from Hecker Fink, and cumulative lost

earnings from other denials, Plaintiff's documented lost wages are reasonably estimated in the range of $515,000–$665,000.

98. In addition to lost wages, Plaintiff has been unable to secure stable housing due to landlords concerns triggered by the false records, has been denied access to credit and capital, and has faced ongoing emotional distress and humiliation. As a direct result of the prolonged periods of unemployment and underemployment caused by Defendants false reporting, Plaintiff was unable to meet financial obligations, resulting in concrete pecuniary losses distinct from lost wages:

a) Late Fees and Financial Penalties. Plaintiff has incurred significant late fees on housing, utilities, and credit accounts due to the sudden loss of income from wrongful employment denials and terminations. These late fees are directly traceable to Defendants false reporting and the resulting employment disruption. Estimated late fees: $30,000-$50,000.

b) Tax Penalties and Interest. Due to sudden loss of income and inability to meet tax obligations on time, Plaintiff has been assessed penalties and interest by tax authorities (IRS and state revenue agencies). These penalties and interest charges are direct financial consequences of the unemployment and underemployment caused by Defendants false background reports. Estimated tax penalties and interest: $50,000-$75,000.

c) Damage to Creditworthiness and Future Interest Costs. Plaintiffs credit score and creditworthiness have been severely damaged by forced missed payments and high credit utilization required to survive during periods of unemployment. As a direct and foreseeable result of Defendants false reporting and resulting employment denials, Plaintiff has been unable to pay his bills on time, resulting in collection accounts, late payment notations, and a significantly reduced credit score. This damage to creditworthiness will result in loss of borrowing power and

cause Plaintiff to incur higher interest rates on future loans (mortgage, automobile, personal loans, refinancing) over the next 5--10 years. The quantified cost of this damage is estimated at $100,000 - $150,000 based on standard rate differentials for poor-credit borrowers over 5-10 years.

d) Credit Repair Costs. Plaintiff will be required to retain professional credit repair services to restore his credit standing and mitigate the ongoing damage caused by the false records. Estimated cost for professional credit repair services: $5,000--$7,000.

e) Harm from Inability to Secure Housing. Landlords have denied Plaintiff housing opportunities based on the same false background records, resulting in inability to secure stable housing and loss of housing equity that would have been built through rent payments. Upon information and belief, at least three separate housing applications were denied or conditioned based on the false violent crime characterization and/or the false outstanding warrant. This has caused Plaintiff homelessness or unstable housing situations, with associated costs for temporary housing, storage, and relocation. Estimated housing-related damages: $100,000.

SUBTOTAL CONSEQUENTIAL ECONOMIC DAMAGES $285,000--382,000

*The Federal Court Order Confirming the Error (December 23, 2024)*

99. On December 23, 2024, the United States District Court for the Middle District of Florida issued an Order granting Plaintiff's Emergency Motion to Correct Clerical Error. See United States District Court for the Middle District of Florida, Case No. 8:01-cr-56-JSM-TGW, Dkt. No. 451 (December 23, 2024).

100. The federal court explicitly ordered the Clerk to strike "VIOLENT CRIME and MACHINE GUN" from the docket sheet and to replace those labels with only "18:924C.F DRUGS."

101. The United States Attorney's Office for the Middle District of Florida agreed with Plaintiff's motion, conceding that the "violent crime/machine gun" characterization was erroneous.

102. This federal court order provides definitive, conclusive evidence that: (a) Plaintiff was NOT convicted of a violent crime; (b) Plaintiff was NOT convicted of or sentenced for machine gun possession; (c) The "violent crime/machine gun" labels on the docket were clerical errors; (d) Defendants' reporting of these false labels was unlawful and defamatory.

103. At the time Defendants were reporting these false labels to employers (Stand Together, Robert Half, Hecker Fin, and others), the labels were false and knowingly contradicted the actual charging documents. Defendants either knew the labels were false or were recklessly indifferent to their falsity.

## V. LEGAL CLAIMS

### CLAIM ONE: VIOLATION OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681e(b)
### (Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy)

*Against LexisNexis, First Advantage, and Global HR Research*

104. Plaintiff repeats and realleges all preceding paragraphs by this reference as if fully set forth.

105. Consumer reporting agencies must "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

106. Defendants are "consumer reporting agencies" or "investigative consumer reporting agencies" engaged in the business of compiling and disseminating consumer reports.

107. Defendants' procedures were not reasonable:

(a) False Outstanding Warrant (CRCAC09520CFANO): The warrant was released on April 16, 2013; Defendants continued reporting it as an active federal warrant through 2024 (11+ years

later); A reasonable procedure would include regular updates from the Pinellas County Clerk confirming status of detainers; Defendants failed to verify that a warrant marked "released" in 2013 was actually still open; Defendants failed to investigate despite the warrant being reported by their customers as problematic.

(b) False "Violent Crime/Machine Gun" Labels (Case 8:01-cr-56-JSM-TGW): The federal docket sheet labels do not match the charging documents; A reasonable procedure would include verification of docket labels against actual indictments and judgments; Defendants copied the incorrect shorthand from the federal docket without verifying its accuracy; Defendants reported a "violent crime/machine gun" characterization that contradicts both the indictment and the actual conviction; When background checks extract docket information, reasonable procedures would include verification against the source documents.

(c) Duplicate Records (1998CF239): The repetition of records artificially inflates Plaintiff's criminal history; A reasonable procedure would include de-duplication and verification of record uniqueness.

108. Defendants' conduct resulted in publication of false information to employers and third parties.

109. Plaintiff was directly harmed by the inaccuracy:

(a) Employment offers (as well as the scope and duration of employment) were placed in jeopardy (Stand Together, Robert Half, Hecker Fink, and countless others);

(b) Employment was denied (Robert Half, others);

(c) Lost wages of at least $515,000, and potentially up to $665,000, as detailed in ¶¶96–97;

(d) Emotional distress and humiliation;

(e) Damage to professional reputation.

110. Defendants knew or should have known that their procedures were inadequate, particularly given:

(a) LexisNexis, First Advantage, and Global HR Research's extensive prior experience with background screening;

(b) The readily available information showing the Pinellas County warrant was released;

(c) The availability of federal charging documents to verify docket labels;

(d) Complaints from users (Stand Together, Plaintiff, others) about the inaccuracy.

111. Plaintiff is entitled to actual damages and attorney's fees under 15 U.S.C. § 1681e.

112. Defendants' conduct was willful or reckless, making Plaintiff entitled to statutory damages and punitive damages as well.

**CLAIM TWO: VIOLATION OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C. §1681i(a)**
**(Failure to Conduct Reasonable Reinvestigation of Disputed Information)**

*Against LexisNexis, First Advantage, and Global HR Research*

113. Plaintiff repeats and realleges all preceding paragraphs by this reference as if fully set forth.

114. The FCRA provides that when a consumer disputes the accuracy of information in a consumer report, the consumer reporting agency must "conduct a reasonable investigation with respect to the accuracy of the information or claim" and "take any appropriate action on the basis of the results of such an investigation." 15 U.S.C. § 1681i(a).

115. Plaintiff submitted the following disputes regarding the false records, including additional disputes that will be identified through discovery, many of which were filed after Defendants were notified that Plaintiff's docket had been corrected and were given proof of that correction:

(a) CFPB Case No. 250118-18131801

(b) CFPB Case No. 250118-18131031

(c) LexisNexis Case No. SF-01759063

(d) LexisNexis Case No. SF-03010676

(e) CFPB Case No. 250118-18132671

(f) LEXIS Demand Letter – 6/17/25 (attached)

116. Defendants failed to conduct a reasonable investigation. Instead, with the exception of the June 17, 2025 Demand Letter (attached), Defendants repeatedly rejected Plaintiff's disputes based on the pretextual claim that they could not "verify his identity."

117. Plaintiff submitted the following identity verification documents:

(a) Government-issued driver's license (standard);

(b) Lease agreements for residential property (standard);

(c) Utility bills (standard);

(d) Additional identification and documentation as requested.

118. These are precisely the documents that the FCRA and industry standards contemplate consumers submitting for identity verification. Defendants' rejection of these documents was not based on any legitimate concern; it was obstructionist.

119. Defendants' refusal to conduct reinvestigation prevented Plaintiff from exercising his statutory rights under the FCRA and resulted in continued publication of false information to employers and third parties.

120. The false records remained in Defendants' systems and continued to be reported even after Plaintiff submitted disputes.

121. When Plaintiff filed the June 17, 2025 Demand Letter (attached), LexisNexis responded by claiming the records "did not exist" in its files—a response that is inconsistent with the fact that the records had been actively reported to employers and background companies.

122. Defendants' conduct constitutes:

(a) Negligent failure to conduct reasonable reinvestigation (§ 1681i(a));

(b) Willful failure to comply with reinvestigation obligations;

(c) Pattern of obstructionist conduct to block Plaintiff's statutory rights;

(d) Direct and documented harm to Plaintiff.

123. Plaintiff suffered direct and documented harm:

(a) Inability to dispute false records during critical employment window (December 2022 through present);

(b) Continued publication of false records for over three years despite disputes;

(c) Resulting employment denials and lost wages;

(d) Emotional distress and anxiety about inability to correct false records.

124. Plaintiff is entitled to statutory damages, actual damages, punitive damages, and attorney's fees under 15 U.S.C. § 1681i(a).

**CLAIM THREE: WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681n(a)**

**(Willful Noncompliance with FCRA Requirements)**

*Against LexisNexis, First Advantage, and Global HR Research*

125. Plaintiff repeats and realleges all preceding paragraphs by this reference as if fully set forth.

126. The FCRA provides that if a consumer reporting agency willfully fails to comply with any requirement imposed under the FCRA, the consumer may recover statutory damages of not

less than $100 and not more than $1,000, punitive damages, and attorney's fees. 15 U.S.C. § 1681n(a).

127. Defendants' conduct demonstrates willfulness:

*Pattern of Obstruction*:

(a) Systematic rejection of disputes over 3+ years;

(b) Pretextual "identity verification" denials;

(c) Refusal to process legitimate disputes with standard documentation.

128. Knowledge of Falsity or Reckless Indifference:

(a) Defendants continued reporting the Pinellas County warrant as "open" when records show it was released in 2013;

(b) Defendants reported "violent crime/machine gun" labels that contradict the charging documents;

(c) Background check companies and employers complained about the inaccuracy (Stand Together);

(d) LexisNexis, as a sophisticated consumer reporting agency, knew or should have known that these characterizations were false.

129. Failure to Correct Despite Notice:

(a) Defendants received notice through multiple dispute submissions;

(b) Defendants received notice through CFPB complaints and a demand letter;

(c) Defendants received notice from employers expressing concern about the characterization;

(d) Despite all this notice, Defendants continued reporting the false information.

130. The December 23, 2024 federal court order, granted and agreed to by the United States Attorney, definitively establishes that:

(a) The "violent crime/machine gun" characterization was false;

(b) The characterization had been wrong for years while Defendants reported it;

(c) The federal government (the original source of the false record) agrees the characterization was erroneous.

131. Defendants' conduct was not merely negligent; it was willful, reckless, or in knowing disregard of Plaintiff's rights.

132. Plaintiff is entitled to statutory damages of $100-$1,000 per willful violation, punitive damages, and attorney's fees.

133. Conservative estimate of violations:

(a) At least 8-10 separate disputes over 3+ years;

(b) Each rejected dispute is a separate willful failure;

(c) Minimum statutory damages: $800-$8,000.

134. In addition, each publication of false information to a new employer could constitute a separate violation.

**CLAIM FOUR: DEFAMATION PER SE - VIRGINIA COMMON LAW**
**(False Accusations of Violent Crime and Machine Gun Possession)**

*Against LexisNexis and First Advantage*

135. Plaintiff repeats and realleges all preceding paragraphs by this reference as if fully set forth.

136. Under Virginia law, defamation per se includes false statements that accuse a person of committing a crime. Virginia recognizes that accusations of criminal conduct, particularly violent crimes, are among the most serious and damaging forms of defamation.

137. Defendants published the following false statements:

(a) Statement 1: "Violent Crime/Drugs/Machine Gun" - False accusation: Plaintiff was convicted of a violent crime; False accusation: Plaintiff possessed a machine gun; These statements were published in background reports provided to employers (Stand Together, Robert Half, Hecker Fink, and numerous others); These statements were false; Plaintiff was not convicted of a violent crime and did not possess a machine gun; The federal court order of December 23, 2024 confirms this falsity;

(b) Statement 2: "Outstanding Federal Warrant" - False accusation: Plaintiff had an active federal warrant; This statement was published in background reports provided to employers and other third parties; This statement was false; the warrant was released on April 16, 2013 (11+ years before the most recent background checks); The Pinellas County Clerk's records confirm this falsity.

138. These statements meet all elements of defamation per se:

(a) False Statement of Fact: The statements are not opinions; they are factual claims about Plaintiff's criminal history; The statements are objectively false as evidenced by the charging documents and the federal court order;

(b) Understood as Defamatory: Statements that accuse a person of violent crime are inherently defamatory; Statements that claim an active warrant exists are inherently defamatory and damaging to reputation; These statements tend to "injure one's reputation in the common estimation of mankind" and tend to "hold him up to scorn, ridicule, or contempt";

(c) Published: Defendants published these statements in background reports; These reports were provided to employers including Stand Together Foundation and Robert Half International; The reports were provided to other employers and third parties; This constitutes publication to third parties;

(d) Plaintiff Suffered Injury: Stand Together Chamber of Commerce placed Plaintiff's conditional job offer and subsequent employment in jeopardy based on the false criminal history reported about him, ultimately terminating his employment shortly before a planned promotion; Robert Half International rejected Plaintiff's application based on the same false background information; and, more recently, Hecker Fink LLP abruptly separated Plaintiff from his six-figure Senior Case Manager position less than a week after he testified as a defense witness in *United States v. Shon R. Hopwood*, during which the government impeached him with a non-existent "armed robbery" conviction traceable to the same erroneous criminal history, despite his prior explanations of the "violent crime/machine gun" and related record errors and the absence of any documented performance issues or misconduct. In addition, other prospective employers either rejected Plaintiff outright or imposed adverse conditions on employment because of these false statements, with numerous additional denials and adverse actions during the same period expected to be revealed through discovery. As a result, Plaintiff has suffered economic losses estimated at approximately $440,000–$640,000 in the form of lost wages, lost promotional opportunities, and lost bonuses, as well as substantial emotional distress, humiliation, and damage to his professional reputation.

139. Defendants' conduct was not merely negligent:

(a) Knowledge of Falsity or Reckless Disregard: LexisNexis and First Advantage knew, or were recklessly indifferent to the fact, that the "violent crime/machine gun" characterization did not match the charging documents; Defendants knew, or were recklessly indifferent to the fact, that they were reporting a warrant that had been released in 2013; When employers and Plaintiff disputed the information, Defendants had notice of the falsity; Defendants' response was not to investigate and correct, but to block disputes with pretextual identity verification denials;

(b) Pattern of Knowing Misrepresentation: Defendants continued reporting these false statements for years after they should have known they were false; Defendants received complaints from users about the inaccuracy; Defendants received dispute submissions from Plaintiff; Despite all this notice, Defendants continued publishing the false statements.

140. Plaintiff is entitled to damages for:

(a) Lost employment opportunities and wages: $515,000–$665,000;

(b) Emotional distress, humiliation, and injury to reputation: $50,000-$100,000;

(c) Punitive damages for reckless or knowing publication of false statements: $200,000-$550,000;

(d) Attorney's fees and costs.

**CLAIM FIVE: VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT, Va. Code § 59.1-200 et seq.**

*Against LexisNexis and First Advantage*

141. Plaintiff repeats and realleges all preceding paragraphs by this reference as if fully set forth.

142. The Virginia Consumer Protection Act prohibits deceptive or unfair practices in trade or commerce that affect the public interest and cause injury to a consumer.

143. Defendants engaged in the following deceptive practices:

(a) Deceptive Reporting of Criminal Records: False reporting of a violent crime conviction; False reporting of machine gun possession; False reporting of an outstanding federal warrant (released in 2013); These false reports were designed to influence and deceive employers regarding Plaintiff's background;

(b) Obstruction of Consumer Rights: Pretextual denial of disputes based on false identity verification claims; Systematic blocking of Plaintiff's statutory right to dispute false information; This obstruction was designed to prevent consumers from correcting errors;

(c) Unfair Practices: Failing to update records that had been corrected in public databases; Refusing to investigate legitimate disputes supported by standard documentation; Continuing to report false information despite notice of falsity.

(d) Employers, including Stand Together, Robert Half, and others relied upon the false reports provided by Defendants in making employment decisions adverse to Plaintiff.

144. Defendants are consumer reporting agencies engaged in trade or commerce in Virginia, affecting consumers and employers throughout the Commonwealth.

145. Plaintiff is a consumer directly affected by the deceptive practices.

146. Plaintiff suffered injury:

(a) Lost employment opportunities and wages;

(b) Damage to credit rating, inability to pay taxes

(b) Inability to obtain housing

(c) Emotional distress and humiliation

(d) Third parties, including employers, relied upon Defendants' false reports in making adverse decisions affecting Plaintiff, causing him to suffer actual damages as set forth herein.

147. Plaintiff is entitled to recover actual damages, civil penalties up to $2,500 per violation, and attorney's fees under the Virginia Consumer Protection Act.

**CLAIM SIX: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

*Against LexisNexis and First Advantage*

148. Plaintiff repeats and realleges all preceding paragraphs by this reference as if fully set forth.

149. Under Virginia law, negligent infliction of emotional distress requires: (a) The defendant's conduct was extreme and outrageous, beyond the bounds of reasonable decency; (b) The defendant acted intentionally or with reckless disregard; (c) The conduct caused severe emotional distress to the plaintiff.

150. Defendants' conduct was extreme and outrageous:

(a) False Accusation of Violent Crime and Machine Gun Possession: Falsely accusing someone of a violent crime is among the most serious allegations; The accusation was published to employers, affecting Plaintiff's ability to work; The false accusation undermined Plaintiff's effort to rebuild his life following executive clemency;

(b) Deliberate Obstruction of Dispute Rights: For over 3 years, Defendants blocked Plaintiff's attempts to correct false information; Defendants used pretextual identity verification denials to block disputes; This obstruction prevented Plaintiff from protecting his reputation and employment prospects;

(c) Knowledge or Recklessness Regarding Falsity: Defendants knew the "violent crime/machine gun" characterization was false or were recklessly indifferent to its falsity; Defendants knew the warrant had been released or were recklessly indifferent to its status; Despite this knowledge/recklessness, Defendants continued publishing the false information and blocking dispute attempts.

151. Defendants' conduct caused physical ailments, injury, and severe emotional distress to Plaintiff:

(a) Anxiety and Stress: Anxiety about employment prospects each time a background check was

conducted; Stress about being unable to correct false accusations of violent crime; Ongoing fear that the false records would continue to affect future employment opportunities;

(b) Humiliation and Shame: Humiliation at having to explain a false "violent crime/machine gun" accusation to potential employers; Humiliation that despite having received presidential clemency and serving 16 years in prison, false accusations continued to follow him; Shame that the government's official clemency determination (non-violent offender) was contradicted by Defendants' reports;

(c) Depression and Hopelessness: Depression resulting from repeated employment denials based on false information; Hopelessness when Defendants blocked his dispute attempts for more than three years; Psychological trauma from the Stand Together, Robert Half, and Hecker Fink incidents and countless other denials.

(d) As a direct and proximate result of Defendants' conduct, Plaintiff's emotional distress has manifested in concrete physical symptoms, including stress-related ulcers, irritable bowel syndrome, chronic insomnia, and hypertension for which he has undergone evaluation and treatment by licensed medical professionals. These physical manifestations are causally linked to the prolonged anxiety, humiliation, and financial instability caused by Defendants' wrongful reporting and obstruction of his dispute rights.

152. Plaintiff is entitled to damages for:

(a) Documented emotional distress: $50,000-$100,000;

(b) Damage to credit rating, inability to pay taxes

(b) Medical expenses if any mental health treatment was sought.

**CLAIM SEVEN: NEGLIGENT MISREPRESENTATION - VIRGINIA COMMON LAW**

*Against Global HR Research, LLC*

153. Plaintiff repeats and realleges all preceding paragraphs by this reference as if fully set forth.

154. Under Virginia law, negligent misrepresentation requires: (a) A false representation of material fact; (b) Knowledge by the defendant that such representation is false or made with reckless disregard for accuracy; (c) Intent to induce reliance on the misrepresentation or such representation is made under circumstances in which the defendant should reasonably expect to induce reliance; (d) Justifiable reliance on the misrepresentation; (e) Resulting damages to the plaintiff.

155. Defendant Global HR Research made the following false representations in its December 20, 2022 background report (Report ID 8877809):

(a) That Plaintiff was convicted of a "violent crime";

(b) That Plaintiff possessed a "machine gun";

(c) That Plaintiff's criminal record was accurately represented in the report.

156. These representations were false. Plaintiff was never convicted of a violent crime. Plaintiff never possessed a machine gun. The characterizations were clerical errors on the federal docket sheet that Global HR Research failed to verify against source documents.

157. Global HR Research made these false representations:

(a) With knowledge that they were false or with reckless disregard for their accuracy;

(b) With intent that Stand Together would rely upon them in making employment decisions;

(c) Under circumstances in which Global HR Research should have known Stand Together would rely upon them.

158. Stand Together did, in fact, rely upon these false representations in making its employment decision(s).

159. As a result of Global HR Research's negligent misrepresentation, Plaintiff suffered:

(a) Loss of employment/promotion opportunity;

(b) Lost wages of approximately $100,000-$150,000;

(c) Emotional distress;

(d) Damage to professional reputation.

160. Global HR Research's conduct was not merely negligent; it was reckless. Global HR Research possessed the means to verify the accuracy of the information (access to federal docket sheets and charging documents) but failed to do so, demonstrating reckless disregard for the truth.

161. Plaintiff is entitled to recover actual damages, emotional distress damages, and punitive damages for Global HR Research's reckless conduct.

**VII. DAMAGES**

A. Actual Damages

Statutory Damages Under the FCRA

162. Plaintiff has suffered quantifiable actual damages because of Defendants' conduct:

(a) Lost Wages – Stand Together Chamber (January 2023–March 2025): Approximately $140,000, including lost wages during unemployment (July 2024–March 2025), salary differential from denied promotion to partnership management role, and lost bonuses and advancement-related compensation.

(b) Lost Wages – Robert Half International (October 2024): Approximately $100,000 in lost employment opportunity.

(c) Lost Wages – Hecker Fink Senior Case Manager Position (2025): Approximately $75,000–$125,000 in lost wages and advancement opportunities from premature termination.

(d) Lost Wages – Other Employment Denials (2017–present): Approximately $200,000–$300,000 in cumulative lost earnings from multiple employment denials and adverse conditions over eight years.

(e) Subtotal Lost Wages: $515,000–$665,000

(f) Consequential Economic Damages:

(i) Late Fees & Financial Penalties: $30,000–$50,000

(ii) Tax Penalties & Interest: $50,000–$75,000

(iii) Damage to Creditworthiness & Future Interest Costs: $100,000–$150,000

(iv) Credit Repair Costs: $5,000–$7,000

(v) Housing Denial Related Damages: $100,000

Subtotal Consequential Damages: $285,000–$382,000

(g) Emotional Distress, Humiliation, and Injury to Reputation: $50,000–$100,000

(h) TOTAL ACTUAL DAMAGES: $850,000–$1,147,000

163. Under 15 U.S.C. 1681na, for willful violations of the FCRA, Plaintiff is entitled to statutory damages of not less than 100 and not more than 1,000 per violation.

164. Plaintiff has identified the following willful violations, and more are likely to be revealed through discovery:

a) CFPB Case No. 250118-18131801 Willful failure to reinvestigate

b) CFPB Case No. 250118-18131031 Willful failure to reinvestigate

c) LexisNexis Case No. SF-01759063 Willful failure to reinvestigate

d) LexisNexis Case No. SF-03010676 Willful failure to reinvestigate

e) CFPB Case No. 250118-18132671 Willful failure to correct

f) LEXIS Demand Letter – 6/17/25 (attached)

165. Minimum statutory damages 5 violations 100 500 Maximum statutory damages 5 violations 1,000 5,000. Given the egregious nature of Defendants conduct 3 year obstruction of dispute rights, statutory damages in the range of 800-1,000 per violation are appropriate, yielding total statutory damages of 4,000-5,000 at minimum.

C. Punitive Damages

166. Defendants conduct warrants substantial punitive damages:

a) LexisNexis Pattern of willful noncompliance with FCRA Prior experience with FCRA litigation LexisNexis has faced multiple prior suits, including Smith v. LexisNexis with 300,000 in punitive damages Knowledge or reckless indifference to falsity Deliberate obstruction of dispute rights Recommended punitive damages 200,000-400,000

b) First Advantage Systematic incorporation and publication of false records Failure to verify accuracy of docket information Recommended punitive damages 150,000-300,000

c) Global HR Research Negligent preparation and transmission of false background report Failure to verify source documents Recommended punitive damages 100,000-200,000.

167. Precedent supports substantial punitive damages *Smith v. LexisNexis Risk Analytics Group, Inc.* Jury awarded 300,000 in punitive damages for FCRA violations Williams v. First Advantage Jury awarded significant punitive damages for inclusion of false criminal records.

D. Attorney Fees and Costs

168. Under 15 U.S.C. 1681e and 1681n, Plaintiff is entitled to recover all costs and expenses, including reasonable attorney fees.

169. This case involves Complex FCRA litigation against sophisticated defendants Extensive factual development employment records, background checks, federal court filings,

CFPB complaints Coordination with multiple employers and governmental agencies Estimated attorney fees $75,000-$150,000.

E. Summary of Damages

170. Total Damages Summary:

a) (a) Actual Damages (Lost Wages + Consequential + Emotional): $850,000–$1,147,000

b) Statutory Damages FCRA $4,000-$5,000

c) Punitive Damages $450,000-$900,000

d) Attorneys Fees Costs $75,000-$150,000

e) **NEW TOTAL: $1,379,000–$2,202,000**

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joshua Keith Boyer respectfully requests that this Court:

Individual Relief Against All Defendants

171. Enter judgment in favor of Plaintiff and against all Defendants;

172. Award Plaintiff actual damages in the amount of $850,000–$1,147,000 for:

(a) Lost wages from employment denials and delayed opportunities;

(b) Consequential economic damages including late fees, tax penalties, credit damage, and housing-related losses;

(c) Emotional distress, humiliation, and injury to professional reputation.

173. Award Plaintiff statutory damages under the Fair Credit Reporting Act in the amount of $4,000-$5,000 for willful violations of 15 U.S.C. § 1681i(a) and § 1681n(a);

174. Award Plaintiff punitive damages in the amount of $450,000-$900,000, recognizing the egregious nature of Defendants' conduct, including:

(a) More Than Three-year pattern of obstructing Plaintiff's statutory dispute rights;

(b) Knowing or reckless publication of false criminal accusations;

(c) Deliberate blocking of identity verification despite receipt of standard documentation.

*Relief Specific to Defendant Global HR Research*

175. Award Plaintiff damages from Global HR Research for negligent preparation and transmission of the December 20, 2022 background report, including:

(a) Actual damages for lost Stand Together employment opportunity: $100,000-$150,000;

(b) Emotional distress caused by Global HR Research's negligence: $25,000-$50,000;

(c) Punitive damages for reckless conduct: $100,000-$200,000;

(d) Attorney's fees and costs attributable to Global HR Research claims;

(e) Pre-judgment and post-judgment interest.

176. Order Global HR Research to:

(a) Conduct an audit of all background reports it has issued to identify any that contained false "violent crime" or "machine gun" characterizations;

(b) Notify all employers who received false reports and transmit corrected reports;

(c) Implement enhanced verification procedures for all federal criminal record information before transmission to employers;

(d) Cease reliance on unverified criminal record summaries from data aggregators without independent verification.

General Relief

177 Award Plaintiff all reasonable attorney's fees and costs incurred in prosecuting this action, estimated at $75,000-$150,000, pursuant to 15 U.S.C. § 1681e(b) and § 1681n(a);

178. Award Plaintiff pre-judgment and post-judgment interest at the maximum rate permitted by law;

179. Award Plaintiff costs of court including filing fees, service costs, and expert witness fees.

180. Order Defendants to:

(a) Conduct a comprehensive audit of all criminal records in their systems;

(b) Verify all docket labels against source charging documents;

(c) Identify and correct all instances of false "violent crime" or "machine gun" labels;

(d) Review all cases involving federal detainers to verify they have been released;

(e) Conduct a de-duplication analysis to remove duplicate records;

(f) Implement reasonable procedures to prevent future inaccuracies;

181. Order Defendants to implement an enhanced identity verification process that:

(a) Accepts standard identity documents including driver's license, utility bills, and lease agreements;

(b) Does not use pretextual identity verification denials to obstruct dispute rights;

(c) Complies with industry standards and FCRA regulations.

182. Order Defendants to publish corrections and deletions of false records to:

(a) All employers who received inaccurate reports;

(b) All credit bureaus and consumer reporting agencies;

(c) The Federal Bureau of Investigation;

(d) The Bureau of Prisons;

(e) Other governmental agencies that may have received inaccurate records.

183. Enjoin Defendants from continuing to report false or inaccurate criminal records;

184. Enjoin Defendants from blocking or obstructing dispute rights;

185. Enjoin Defendants from using pretextual identity verification denials to prevent consumers from exercising FCRA rights;

186. Award such other and further relief as the Court deems just, proper, and equitable under the circumstances.

**IX. JURY TRIAL DEMAND**

187. Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiff respectfully demands a trial by jury on all issues of fact in this action.

**X. CERTIFICATION**

188. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. I am aware that false statements herein are subject to penalties of perjury.

Executed this 4TH day of November 2025.

Respectfully submitted,

Joshua Keith Boyer
137 East Reed Avenue
Alexandria, Va 22305
727-452-9947
jboyer727813@gmail.com

*PLAINTIFF*

**NOTICE OF PRESERVATION OF EVIDENCE**

189. Plaintiff hereby puts Defendants on notice of their duty to preserve all data, including "archived," "purged," or "tape" backups of consumer report transmission logs, inquiry logs, and

dispute correspondence relating to Plaintiff dating back to January 1, 2017. This includes metadata showing when the "Violent Crime" and “Open Warrant” tags were first added to, or have been removed from their database schemes and all records of communications regarding identity verification denials.

FILED
MAILROOM
FEB - 3 2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
______________ DIVISION

JOSHUA BOYER
Plaintiff(s),

v.

Civil Action Number: 1:26 CV 319

LEXIS NEXIS, HR GLOBAL, FIRST ADVANTAGE
Defendant(s),

LOCAL RULE 83.1 (N) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared or assisted in the preparation of THE COMPLAINT.
(Title of Document)

JOSHUA BOYER
Name of *Pro Se* Party (Print or Type)

[signature]
Signature of *Pro Se* Party

Executed on: 1/29/26 (Date)

OR

The following attorney(s) prepared or assisted me in preparation of ______________.
(Title of Document)

______________
(Name of Attorney)

______________
(Address of Attorney)

______________
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document.

______________
(Name of *Pro Se* Party (Print or Type)

______________
Signature of *Pro Se* Party

Executed on: ______________ (Date)